IN RE PETITION OF MERTON C. JORDET AND ANOTHER
WHEREIN SAID MERTON C. JORDET SEEKS TO
ADOPT ROBERT LLOYD WILKINSON, JR.
MERTON C. JORDET AND ANOTHER v.
ROBERT L. WILKINSON, SR.

80 N. W. (2d) 642.

January 11, 1957—No. 36,936.

*Bertie, Bettenburg & Faricy,* for appellant.
*Knutson & Knutson,* for respondents.

NELSON, JUDGE.

Appeal from a judgment decreeing Robert Lloyd Wilkinson, Jr., a minor, to be the adopted child of Merton C. Jordet, which judg-

ment was granted upon the petition of said Merton C. Jordet and Elsie C. Jordet, his wife, the child's natural mother.

Elsie C. Jordet and Robert Lloyd Wilkinson, Sr., the child's natural father, who was objector below and who brings this appeal, were married in Chicago, Illinois, on November 1, 1945. The child Robert Lloyd Wilkinson, Jr., was born as the issue of this marriage on November 9, 1947. They moved to Rockford, Illinois, in 1948 where they acquired and furnished a home. In March or April 1949, Elsie abandoned her home and child and remained away for approximately two years. During her absence her husband cared for and raised the child until it had reached the age of 2½ years, the abandonment having occurred when the child was nine months old. The father had the aid of Elsie's sister and her mother in caring for the child. During this time Elsie frequently visited the child.

The Wilkinsons were divorced in 1950, the court awarding the custody of the child to the father. He thereafter remarried, but in 1952 he was divorced from his second wife and remarried Elsie. A short time after their second marriage they were again divorced, this time in an uncontested proceeding, Elsie being granted the divorce and custody of the child and Robert, Sr., being granted certain rights of visitation. The second marriage of Robert, Sr., to Elsie was of short duration; they only lived together for about a month. He left her on this occasion and after the divorce he remarried his second wife, who had a child by a prior marriage, which child he later adopted. Robert, Sr., has therefore been married four times, twice to Elsie and twice to his present wife.

In May 1953 Elsie moved from Minneapolis, her residence at the time of the second divorce, to Sacred Heart, Minnesota, and rented living quarters for herself and Robert, Jr., in the home of the parents of petitioner Merton C. Jordet, who at the time was resident therein. On July 25, 1953, Elsie and Merton were married to each other at Granite Falls, Minnesota.

Merton C. Jordet was 31 years of age, and Elsie, his wife, 28 years of age at the time of the adoption proceedings. They reside in the village of Sacred Heart, where Merton is self-employed with

his brother in a service station and bulk delivery establishment. Robert, Jr., has resided with them since their marriage, and Elsie has joined in the petition consenting in writing to his adoption by her husband Merton C. Jordet.

Robert, Sr., now resides in St. Paul, Minnesota. He is engaged in trucking, operating the St. Paul Transportation Company, from which he takes out for himself about $6,000 a year. He testified that at the beginning of 1954 his net worth was roughly $85,000.

The second decree of divorce, entered August 28, 1952, provided an award of $15 a week as support money for the child and has remained unchanged. Robert, Sr., met all support payments until May 12, 1953, but since then he has only paid $325 toward Robert, Jr.'s support. Elsie testified that she had to call him often concerning the payments. The testimony indicates that his failure to comply with the terms of the order for support payments is without lawful excuse and also that he has only meagerly availed himself of the visitation privileges granted to him. He says he stopped making payments regularly after Elsie left Minneapolis; that he made a couple of payments to her at Sacred Heart but gave as an excuse that he was not acquainted with the town, did not know where in Sacred Heart she lived, and did not know how small the town was; and that otherwise he would have come out sooner to visit Robert, Jr. He gave as his reasons for his failure to exercise his visitation privileges that he did not have Elsie's address; he thought that, if he mailed a letter to her in Sacred Heart, no one would know who she was. He testified that he finally located Elsie and Robert, Jr., just before Christmas in 1953.

Elsie in answer to a question by objector's attorney testified as follows:

"Q. Now, when you moved from Minneapolis to Sacred Heart in 1953, May 12th, what notice, if any, did you give to Mr. Wilkinson of your removal from Minneapolis?

"A. I called him and I told him that I was moving.

"Q. You called him and told him.

"A. Yes.

"Q. Did you tell him where you were going to be?

"A. I told him where I was going to be."

Then again objector's attorney asked:

"Q. Did you give him an address that you would be at in Sacred Heart?

"A. There is no address outside of just my name and the town; that is the address."

Objector assigns error as follows: (1) "That the Trial Court erred in rejecting testimony tending to show what would be to the best interests of the child sought to be adopted and in refusing to consider facts which took place in point of time prior to the date of the divorce decree awarding custody of the child to the mother and rights of visitation to the father"; (2) "That the Trial Court erred in ruling that it had not the power to look beyond the decision of the Court in the divorce action in hearing and considering facts concerning the upbringing of the child, the relationship between the child and its parents, and the welfare and best interests of the child."

This presents the legal issue whether it was an abuse of discretion for the trial court to refuse to consider facts concerning relations between the natural parents and the child prior to the entry of the second divorce decree. The same issue involves the question whether evidence tending to prove that Elsie abandoned the child now sought to be adopted by her present husband and remained away, except for visitations, for nearly two years, during which time the natural father cared for the child with the aid of Elsie's mother and sister, ought to have been admitted by the court in order to more fully test what would be for the best interest of the child. It must be kept in mind that these facts, which objector sought to have elicited, concerned matters occurring prior to the entry of the second divorce decree awarding the custody of the child Robert, Jr., to Elsie.

Objector argues that the trial court confused the difference between the custodial aspects of a divorce decree favoring the mother with custody of the child while giving rights of visitation to the

father and the effect of granting an adoption changing the status of the child concerning his father and terminating all right of visitation and association between him and his natural son. No attempt had been made to change or modify the custody provisions. Petitioners have had custody and control over Robert, Jr., since their marriage July 25, 1953, Elsie theretofore since August 28, 1952. However, objector argues that the court was not justified in restricting the evidence to a mere consideration of matters concerning the relationship of the proposed adoptive parent subsequent to August 28, 1952, and rejecting the proffered testimony concerning the father's custody and care of the child prior thereto. The rejected evidence, it is argued, would have shed additional light on the basic question of what in the instant case would be for the best interests of the child. It is further argued that the court in failing to hear the evidence did not avail itself of the broad discretionary powers granted to it in adoption proceedings to consider all material facts bearing upon the welfare of Robert, Jr., and what would be for the best interests of a child of his years; that such evidence, if admitted, would have placed the natural father's position in a different light and furnished ample support for his claim that his visitation rights ought not to be denied him; and, finally, that the petition for adoption of Robert, Jr., should have been denied without disturbing Elsie's right to custody nor the visitation rights of Robert, Sr.

We cannot overlook and must consider that part of the record wherein counsel for objector at the close of the testimony and in open court said:

"* * * I would like to point out that we have no objection to the honesty and integrity, moral character or of anything else concerning Mr. Jordet. We assume that he is a fine man, that he is going to be a credit to the community, and a fine person to have in charge of young Bobby Wilkinson, and there is no objection along that line at all. * * *

"We do not intend to institute any proceedings to take the custody away from the mother. *We don't claim that she is an unfit mother, and the only thing that we claim is that so long as they can*

*have him and bring him up and treat him with certain love and affection, doesn't mean that they should be entitled to remove him permanently from the control or the rights of the natural father who has had so much to do in bringing the child up after the mother has left him with him."* (Italics supplied.)

■ We recognize that the court must give consideration to the fact that the right of visitation will be eliminated by an adoption decree. However, the right of visitation in itself is not enough to require the denial of a petition for adoption. M. S. A. 259.22 provides that adoption proceedings may be by petition, and § 259.23 provides that the district court shall have original jurisdiction in all adoption proceedings, the proper venue for an adoption proceeding being the county of the petitioner's residence. It also outlines what the contents of an adoption petition shall be. Section 259.24, subd. 1(b), provides that "Consent shall not be required of a parent who has abandoned the child, *or of a parent who has lost custody of the child through a divorce decree, and upon whom notice has been served as required by section 259.26.*" (Italics supplied.)

■ Under our statutes it is provided that the court shall determine rights in an adoption proceeding in accordance with the best interests of the child. § 259.28. Our decisions hold that the trial court is vested with a broad discretion to aid it in attaining that goal.

Adoption was unknown at common law, and therefore we must go to the statute from which the right to adopt another's child derives its authority. The power to decree an adoption being purely statutory, the statute is the measure of the court's authority. In re Adoption of Anderson, 235 Minn. 192, 50 N. W. (2d) 278.

Adoption statutes are to be liberally construed to accomplish their purpose, and there need not be more than a substantial compliance with their requirements to sustain validity of adoption proceedings. In re Adoption of Anderson, *supra.*

The "care and custody" was expressly awarded to the natural mother by the divorce decree. It might be well to point out that it has been made clear by our present adoption statutes enacted by

L. 1951, c. 508, and codified as M. S. A. 259.21 to 259.32, that a divorced parent not having custody of the child is subject to the provisions of § 259.24, subd. 1(b). He is insured the right and the opportunity to be heard in the proceeding when the propriety or the wisdom of the proposed adoption is adjudicated. He is, however, given no right of veto.

The fact that "the right of visitation" was given to the natural father in the divorce and custody decree in the instant case is not under our statutes and decisions a valid and controlling argument against the adoption. It is only one of the elements among others to be considered. The controlling question is whether, under the evidence, it would promote the best interests of the child to deny the adoption and continue the rights of visitation granted to the natural father and compel the petitioners to retain the child's present name, on the one hand, or to grant the adoption and deny the rights of visitation, giving to petitioners the obvious advantage, important both to the petitioners' and the child's welfare, of having the child carry the name of parents in whose home he is being reared, they in turn becoming legally obligated for his care, education, and maintenance.

The court below, having listened to the admissions as to the present fitness of petitioners, might well have concluded that the child would be better off to be known among his associates by the name of the people with whom he makes his home. The enforced use of objector's name, even though it be that of the natural father with visitation privileges, could under the circumstances, to the disadvantage of the child, advertise the fact that he had come from a broken home. Two marriages had not sufficed to keep it together.

A termination of the objector's visitation privileges following from the decree of legal adoption finds support in the record. It is supplemented by the investigation and the report of the director of public welfare recommending adoption. The paramount question of what is for the best interests of the child has clearly not been overlooked.

In In re Adoption of Jaren, 223 Minn. 561, 27 N. W. (2d) 656, we said that in a court's determination of adoption proceedings the welfare of the child is of paramount concern and other interests must yield to gain that end. The welfare of the child is the paramount consideration in all courts of record in proceedings involving the custody of children. 1 Am. Jur., Adoption of Children, § 46.

Our statutes provide that the obligations of the adopting parent are the same as those of a natural parent and he is therefore bound to give the child the same support, care, and maintenance and the same humane treatment to which the child would be entitled if born to him in lawful wedlock, and he is legally subject to all civil remedies allowed and provided against a natural parent to enforce proper and suitable care and maintenance of the child. Even though the consent of the father is not essential under certain circumstances and conditions, the courts must, nevertheless, give consideration at all times to the paramount problem of what is for the best interests and welfare of the child.

■ The right of visitation in itself is not enough to require the refusal of a petition for adoption.[1] However, the fact that such right will be eliminated by an adoption decree requires that this right be carefully considered in the court's approach to the problem from the controlling standpoint of what is for the best interests of the child.

The court below upon formal motion made by counsel for objector ordered that the question of the fitness of the adopting petitioners be submitted to the commissioner of public welfare for purposes of investigation and the submission of a report to the court, the same to be filed with the clerk and the respective parties advised of its filing, before the court's determination of the adoption proceeding, in the event there should be something additional for the court to consider in connection with the testimony produced at the hearing. The court had the benefit of this investigation and a report from the commissioner of public welfare both on the fitness of the petitioner,

[1]See, In re Adoption of Chinn, 238 Iowa 4, 25 N. W. (2d) 735; In re Adoption of Perkins, 242 Iowa 1374, 49 N. W. (2d) 248.

Merton C. Jordet, as an adopting parent, and Elsie, his wife, as the consenting petitioner and natural mother of Robert, Jr.

■ In Arne v. Holland, 85 Minn. 401, 404, 89 N. W. 3, 4, this court said in regard to the line of inquiry to be pursued where the child's interests demand a modification of custody and visitation privileges involved in a former divorce decree:

"\* \* \* Every decree of divorce is entered in pursuance of, and is founded upon, the statute. The statute contemplates a short and speedy remedy regarding the modification of such decrees or orders. The ultimate question \* \* \* is, do the child's interests demand a modification of a preceding order?

*"The court is not limited to any particular line of inquiry, and is not bound by the strict legal rules governing the introduction of evidence, and its orders and directions in that respect cannot be subject to the same legal tests usually applicable in the trial of causes. The test to determine the validity of the court's order in such proceedings is, was there an abuse of discretion?"* (Italics supplied.)

In Novotny v. Novotny, 152 Minn. 420, 422, 189 N. W. 258, 259, we said:

"The courts have always found it a difficult matter to harmonize the wishes of divorced parents with respect to their future relations toward their children. In a general way the problem is one to be solved by the trial courts. In solving it, they are invested with a broad discretion, this court being reluctant to interfere in the absence of a showing that there has been arbitrary action, or, as more commonly stated, an abuse of discretion."[2]

It is evident from the broad discretion which has been granted to the trial courts in harmonizing the wishes of divorced parents with respect to their future relations toward their children that they are not limited to any particular line of inquiry or by strict legal rules of evidence, and this disposes of what seems to be the sole question presented on this appeal, that is, the claimed error

[2]Also see, In re Adoption of Jaren, *supra;* In re Adoption of Anderson, *supra;* Spratt v. Spratt, 151 Minn. 458, 185 N. W. 509, 187 N. W. 227.

in the trial court's ruling that testimony as to facts occurring prior to the divorce decree of 1952, in which Elsie C. Jordet was granted custody of the child, was inadmissible. Three witnesses testified as to the qualifications and fitness of Elsie Jordet and her husband. They unanimously agreed that Elsie was a good housekeeper, that she and her husband got along well, that the child was well cared for, and that the home provided by Elsie and her husband was well suited to the needs of the child. Confronted with this evidence, the trial court, vested with broad discretion granted to it in custody and adoption proceedings, could well conclude that whatever the previous behavior of Elsie, evidence of that behavior now would not be helpful or significant in view of Elsie's circumspect conduct in her marriage to her present husband and his apparent fitness to become an adopting parent. Vested with a broad discretion in determining the line of inquiry to be pursued in a controversy of this nature, it was for the trial court to admit or exclude evidence according to its appraisal as to its value and its bearing on the issues in dispute between the parties. When all the circumstances which the record discloses are carefully scrutinized, we fail to find wherein the court erred in its rulings. It did not abuse its discretion therein.

Objector complains that the trial court's order granting the adoption vitiates his right of visitation which was granted to him by the second divorce decree. It is admitted that such is the effect of the order. However, where, as in this case, the evidence indicates that the natural father exercised his rights of visitation only sporadically, and further that the natural father failed to comply with the court's order for payment of support money, being in view of his own financial circumstances, almost grossly delinquent therein, the trial court might well conclude that his rights of visitation were no longer essential to the best interests of the child.

■ The burden of proof is upon petitioners in an adoption proceeding to establish the facts sufficient to justify adoption.

We conclude in the instant case that upon the record the petitioners have met the required burden of proof and that the court's find-

ing that the petitioners are fit and proper persons to have said child, granting adoption as prayed for in their petition, is justified upon the record before this court as being for the child's best interests.

Affirmed.

THOMAS GALLAGHER, JUDGE (dissenting).

The effect of the order of the trial court, which is affirmed here, is to deny forever to Robert Lloyd Wilkinson, natural father of Robert Lloyd Wilkinson, Jr., 9 years of age, not only the visitation rights accorded to him in a divorce decree but also the right to any future contact with his son for whom he feels a deep love and affection.

The language of M. S. A. 259.24, subd. 1, which the majority asserts compels this result, specifies that:

"No child shall be adopted without the consent of his parents and his guardian, if there be one, except in the following instances:

\* \* \* \* \*

"(b) Consent shall not be required of a parent who has abandoned the child, or of a parent who has lost custody of the child through a divorce decree, \* \* \*."

In the divorce proceedings, upon stipulation of the parties, custody of the child was awarded to the mother, Elsie C. Wilkinson, now Elsie C. Jordet, one of the petitioners herein. This award was "subject \* \* \* to the right of the defendant to take said child with him once each month for a period not to exceed two (2) days, provided, however, that such visitation does not interfere with the education of said child and provided further than under no circumstances shall the defendant take said child outside of the State of Minnesota." The order further provided that Robert Lloyd Wilkinson pay the sum of $15 per week for the child's support.

The judgment therein was entered August 28, 1952. During the following May, the mother, without the knowledge or consent of the father, moved with the child from Minneapolis to Sacred Heart, Minnesota, to the home of the parents of her present husband, Merton C. Jordet. At no time thereafter did she advise the father as to her new residence. He testified that he was unable to locate either the child or the mother until December of 1953; that when he first learned

that they had gone to Sacred Heart he went there and was told that they had gone west; that he talked to the father of Merton C. Jordet, petitioner, but "didn't get any information whatsoever, and * * * kept checking to see if they ever came back to Sacred Heart, and * * * finally found them just before Christmas 1953."

With reference to the payments required by the decree, he testified that he had made such payments up to the time his former wife had left Minneapolis, but since then such payments had fallen in arrears; that he discontinued them after she left mainly because she would not allow him to take the boy on visits; that at times when she was in Minneapolis or St. Paul and he had asked her if he might keep the child a day or so, she had insisted that he return the child after about three hours. He further testified that he is engaged in the trucking business in St. Paul; that, while it was not easy for him to get away from his work, he had gone to Sacred Heart to visit his son at least every two or three months after he had located the child there; that it was his intention to include his boy as a participant in his estate which would likely be in a substantial amount; and that he carried health insurance covering the boy.

The record indicates that, in a prior divorce proceeding between the same parties, the mother had left the child, then only 9 months old, at the home of the parties, which was then in Rockford, Illinois, and that thereafter the father had cared for the child without assistance from the mother who had remained away from him for a period of approximately two years. He testified that, in the divorce proceedings involved herein, he had stipulated and consented to the award of custody to the mother with the specific understanding that in return therefor he would be accorded reasonable visitation rights including the right to "have the boy once in a while."

A reasonable construction of § 259.24, subd. 1(b), would not seem to require a determination that, when there has been an award of a child's custody to one parent in a divorce proceeding, and such award has been made contingent upon reasonable visitation rights being accorded to the other parent, such award is absolute to the extent of compelling a finding that thereafter the necessity of obtain-

ing the written consent of the latter parent in subsequent adoption proceedings involving the child was thereby eliminated. To hold thus is to effectuate a means whereby a parent, bearing a deep love for a child and without serious fault, is forever cut off from the child merely because, in an act of compromise or kindness, consent has been given to an award of the child's custody to the other parent. I do not believe the legislature intended that § 259.24, subd. 1(b), be given such a harsh and arbitrary effect. This seems to be particularly true when it is recalled that by virtue of § 518.18 an award of custody in divorce proceedings is never regarded as final and may at any time be modified when a child's best interest would so require.